```
 1                 UNITED STATES DISTRICT COURT

 2           WESTERN DISTRICT OF WASHINGTON AT SEATTLE

 3     _____

 4                                  )
       UNITED STATES OF AMERICA,     )  CR13-239Z
 5                                  )
                    Plaintiff,       )  SEATTLE, WASHINGTON
 6                                  )
       v.                            )  March 19, 2015
 7                                  )
       THOMAS R. HAZELRIGG III,      )  Sentencing Hearing
 8                                  )
                    Defendant.       )
 9
10     _____

11              VERBATIM REPORT OF PROCEEDINGS
           BEFORE THE HONORABLE THOMAS S. ZILLY
12              UNITED STATES DISTRICT JUDGE
       _____

13

14     APPEARANCES:

15

16     For the Plaintiff:     Matthew Diggs
                               Brian Werner
17                             U.S. Attorney's Office
                               700 Stewart Street, Suite 5220
18                             Seattle, WA 98101

19

20     For the Defendant:     Stephan R. Illa
                               Law Office of Stephan R. Illa
21                             PO Box 1003
                               Bainbridge Island, WA 98100

22

23

24

25
```

1          THE COURT:  Good afternoon, ladies and gentlemen.

2     Please be seated.

3          Clerk, please call the calendar.

4          THE CLERK:  Thank you, Your Honor.

5          Case CR13-239Z, United States of America v. Thomas R.

6     Hazelrigg III.

7          Counsel, will you please stand and make your appearances

8     for the record?

9          MR. DIGGS:  Good afternoon, Your Honor.  Matthew

10    Diggs on behalf of the United States.

11         MR. WERNER:  And Brian Werner on behalf of the United

12    States.  Good afternoon, Your Honor.

13         THE COURT:  Good afternoon, counsel.

14         MR. ILLA:  Stephan Illa appearing on behalf of the

15    defendant, Mr. Thomas Roy Hazelrigg III.  He's here with me

16    today, Your Honor.

17         THE COURT:  Good afternoon.

18         Are the parties ready to proceed with sentencing in this

19    matter?

20         MR. DIGGS:  Yes, Your Honor.

21         MR. ILLA:  Yes, Your Honor.

22         THE COURT:  All right.  Did the defendant receive the

23    presentence investigation report and sentencing

24    recommendations of probation?

25         MR. ILLA:  He did, Your Honor.

1          THE COURT:  All right.  In addition, I have received

2    and reviewed the proposed judgment, the government's

3    sentencing memo.  The sentencing memo includes attachments --

4    they're contained in a notebook I got -- with Exhibit F, and

5    I have reviewed all of the exhibits that have been attached

6    and the transcripts that the government has pointed us to.  I

7    have reviewed the defendant's sentencing memo and Attachments

8    A through D.  Specifically, I have read the defendant's

9    description of his health issues.  I have read the doctor's

10   report, Dr. Pineda-Liu -- let me get that -- Pineda-Liu and

11   all of the attachments that were presented.  I have looked at

12   and considered the declaration of Dr. James Pelton, who's the

13   Western Regional Medical Director for the Bureau of Prisons,

14   I have reviewed the release status report of probation.  And

15   then I received a stack of material, "45 years ago" it starts

16   at the top.  Mr. Hazelrigg, I think, put together a packet of

17   materials for me to look at.  And I have reviewed the

18   defendant's objections and revisions to the draft report.

19      Is there anything else I should have received and

20   reviewed?

21          MR. DIGGS:  Not from the government, Your Honor.

22          MR. ILLA:  As far as the last packet the court

23   referred to, the one from Mr. Hazelrigg, I just wanted to

24   make sure the government has a copy of that also.  I don't

25   know if he gave that to them or not.  I want to make sure.

1           MR. DIGGS:  Is this what was filed with the

2     sentencing memorandum?

3           MR. ILLA:  It was something that the judge just

4     referred to, and my eyes got big, because I didn't --

5           THE COURT:  I'm going to hand it down to you,

6     counsel, so you can take a look and see if you have seen it.

7           MR. ILLA:  Your Honor, may I approach to just take a

8     quick look at that and make sure?  Thank you.

9       Okay.  Thank you.  Thanks, Your Honor.

10          THE COURT:  Have we got everything?

11          MR. ILLA:  Yes, Your Honor.

12          MR. DIGGS:  Your Honor, I'm confident we have seen

13    those medical records, whether they were filed or we received

14    them from the probation office.

15          THE COURT:  All right.  I know that there are

16    disputes both with the facts and with the guideline

17    computations.  The guideline computations are not binding on

18    me, but I must make findings with respect to them.  So,

19    first, let's deal with the facts.

20      Are there any facts stated in the presentence report,

21    which are important with respect to the guideline

22    computations, are there any facts in dispute there?

23          MR. DIGGS:  Not on behalf of the government.

24          MR. ILLA:  On behalf of the defense, there are two

25    areas of dispute, Your Honor, that directly affect the

1   calculations.  The first has to do with an enhancement

2   requested by probation and the government for obstruction of

3   justice.  The defendant's position is that he did not commit

4   perjury at trial.  The argument supporting that is simply

5   that the jury's verdict, typically, in a case where a

6   defendant testifies, will often speak unambiguously toward

7   the veracity of the defendant.

8            THE COURT:  All right.  You will get a chance to

9   argue the obstruction issue.  The question is now, what facts

10  are in the presentence report that you are objecting to?  Can

11  you tell me the paragraphs and the facts?

12           MR. ILLA:  There are assertions in the presentence

13  report that he committed perjury, Your Honor.  That's what

14  I'm just referring to.

15           THE COURT:  All right.  I understand your objection

16  to that.

17           MR. ILLA:  Okay.

18     And then, second, Your Honor, on a sort of philosophical

19  level, on this role adjustment, I think that that is

20  problematic, and I'm prepared to argue that when the court is

21  ready.

22           THE COURT:  All right.  Well, let me then adopt --

23  Thank you.  I'm going to adopt as facts the facts stated in

24  the presentence report, but withhold a ruling on the

25  obstruction of justice and the role adjustment until I have

1   heard further argument, to the extent I think I need it.  And

2   based on those facts, which I adopt, I make the following

3   tentative guideline computations.  And everybody should

4   understand, the guidelines need to be calculated, but they're

5   not binding on me.  I must consider the factors set forth in

6   the statute that outlines the various things I've considered.

7       But having said that, it's my tentative ruling that the

8   base offense level is 22, so there's no change from the

9   presentence report; that two points should be added for

10  sophisticated means.  And I don't know if there was any

11  dispute on that.  I'm tentatively not going to give the

12  adjustment for role in the offense.  And I will make findings

13  after I hear argument, to the extent the government wishes to

14  argue it.  I tentatively am going to adjust upward two points

15  for obstruction of justice.  All of that would mean that the

16  adjusted offense level would be 26, criminal history category

17  I, and 63 to 78 months would be the guidelines under that

18  ruling.

19      So let me take the two issues which I think are -- Let's

20  take them in the order of the presentence report.

21      Does the government wish to be heard on the adjustment for

22  role?

23          MR. DIGGS:  Yes, Your Honor.

24      Thank you, Your Honor.  May it please the court, the

25  government supports this enhancement, which the court must

1   find by a preponderance of the evidence, for two predominant

2   reasons:  Mr. Hazelrigg caused his sons to file false tax

3   returns in furtherance of his own tax evasion.  And when you

4   take this out of the conduct -- or the context,

5   Mr. Hazelrigg's testimony at trial, and look at what the

6   actual facts were, Mr. Hazelrigg's younger son, Aaron

7   Hazelrigg, at the age of 32, filed a tax return showing that

8   he made $5.5 million.  That money was not earned by him.  It

9   was earned by his father.  The year before, Aaron Hazelrigg

10  filed a tax return showing he earned $60,000.  His older

11  brother, Thomas Hazelrigg, did essentially the same thing.

12  They did this for tax years 2005 and 2006.

13       The money to pay those taxes came from the Friends and

14  Family account.  When the defendant told Wayne Lau, a banker,

15  and when he told another banker what he did here, the terms

16  were "deflected his income," "allocated his income."  These

17  sons' returns were unquestionably false.  So that is criminal

18  conduct.

19       We know that Aaron Hazelrigg was not guaranteeing loans

20  for Centurion Financial Group in 2005, because Scott Switzer,

21  the accountant, testified that if Centurion Financial Group

22  had taken any loans, the interest on those loans would have

23  been reported on Centurion's tax returns.  No interest was

24  reported.

25       These tax returns were false.  The defendant was a

1    participant in -- Excuse me.  The defendant's sons were

2    participants in the father's scheme to evade taxes.  There's

3    no other reason to file these false tax returns.  The returns

4    show that they made millions of dollars.  All they got, their

5    testimony was very clear -- and the defendant took issue with

6    this in his sentencing memorandum, but the defendant is

7    wrong -- the sons' testimony was very clear that they filed

8    tax returns showing income they did not earn.

9         The question to Aaron Hazelrigg, on page 33 of the

10   transcript, was, "How much did you get?"  The answer, "I got

11   approximately just the sum to pay the taxes."  The question

12   to Thomas Hazelrigg IV, "Other than the tax distribution,

13   have you received any money from Centurion Financial Group?"

14   The answer, "No."

15        So that's the first basis, the false tax returns.  That

16   money was allocated to the defendant's sons so that the

17   defendant did not have to report it during the period he owed

18   the IRS more than a million dollars.

19        The second basis is the defendant's purchasing the

20   residences where their father was paying not some, but all of

21   the bills:  all of the equity payments, all of the mortgage

22   payments, all of the bills.  He was listing the residences on

23   his financial statements, which he regularly shared with the

24   sons.

25        Now, Aaron Hazelrigg and Thomas Hazelrigg IV are

1    sophisticated men.  They have college degrees.  They work in

2    the real estate and lending industry.  It absolutely strains

3    credibility to suggest that they were not knowing

4    participants when they put their name on property that their

5    father was making all of the payments for.  You know, now,

6    maybe he told them that he didn't think he owed the taxes or

7    that this was some part of a family estate plan, and, you

8    know, in the long run, it would be part of their inheritance.

9    But that's his self-serving story.  They knew that they

10   didn't own these houses; that the father did.

11        There are two arguments from the defense.  First, well, if

12   the kids are in on this, why does Mr. Hazelrigg need to forge

13   their signature?  And we're not saying that Mr. Hazelrigg

14   wasn't the leader, that he wasn't the one in control of all

15   of this.  He used his kids.  There's no doubt about that.  He

16   used his sons.  But that doesn't mean they weren't knowingly

17   used, that they weren't also accomplices.  Those two things

18   are not mutually exclusive.

19        The second argument is, well, the government didn't charge

20   the sons with criminal conduct.  That's true.  But the

21   guidelines make clear that a participant does not need to be

22   convicted.  The sons absolutely realize they had exposure in

23   this matter.  They saw it, and they were granted immunity.

24        And when we look at the equities of this, all of the

25   benefit in this scheme went to Mr. Hazelrigg III.  We don't

1  see the benefit going to the sons.  They just, essentially,

2  took the risk, and they were on the hook at the end of the

3  day.

4      So based on that factual basis, which I think is the

5  strongest factual basis, we argue that the defendant

6  controlled and organized two participants, his sons, to

7  further his criminal conduct, and therefore qualifies for the

8  two-level enhancement for the aggravating role.

9          THE COURT:  Are you relying on the two sons now and

10  not Mr. Switzer and deGooyer?

11          MR. DIGGS:  I will address Mr. Switzer and deGooyer

12  later in my presentation.  But with regard to the aggravating

13  role, yes.

14          THE COURT:  All right.

15      Counsel.

16          MR. ILLA:  Your Honor, it's unusual for the

17  government to shift the theory of its case, especially after

18  it wins at trial.  But here -- I sat through the same trial

19  you listened to -- the government's theory from the word "go"

20  was that Mr. Hazelrigg was the mastermind, not that he had

21  any accomplices or co-conspirators, but that he was the one

22  doing evil things.

23      And, in fact, aspects of that story keep surfacing in the

24  government's own arguments.  At some point, they say that he

25  recruited his sons as accomplices.  At other points, they

1    switch back to saying that he used them as pawns, that he

2    caused them to help him, that he abused his position of

3    financial power, and his family members were, thus, somehow

4    caused to help him achieve his criminal purposes.  Now,

5    ordinarily, there might be a question as to whether or not

6    asking the sons about this would be appropriate.  And,

7    ordinarily, you wouldn't be able to, because they would

8    assert their privilege, and you would have a black box and no

9    way to figure it out.  Here, of course, we had both sons

10   testify at trial in response to the government's subpoena and

11   compulsion order.  So both of them were on the stand, both

12   testified, and yet the government never bothered to ask them

13   a single question trying to establish their knowing

14   participation in tax evasion.  How curious.  Because if,

15   indeed, they were accomplices, that would have been the best

16   time to ask them that question, when they're under oath, on

17   the witness stand, with full immunity.  And yet the

18   government didn't do that.  Now, I submit that the reason

19   they didn't do that is because they knew darn well that these

20   people had no idea about the exact criminal intent that their

21   father may have had.  What they did, instead, was what he

22   wanted them to do.

23        We saw e-mail after e-mail, during the trial, of

24   Mr. Hazelrigg sending directives to his sons, giving orders,

25   as it were, having accounting documents prepared for them to

 1   file.  Whether or not they had the requisite criminal intent

 2   is something that just hasn't been established.

 3       The definition of an accomplice is quite clear.  It

 4   requires that you must act with intent to facilitate the

 5   offense.  You must actively participate in a criminal venture

 6   with advance notice of the crime and having acquired that

 7   knowledge when they had a realistic opportunity to withdraw

 8   from the crime.

 9       Based on that legal standard, Your Honor, we don't have

10   that evidence because of that failure of proof.  And, also,

11   there's probably not a valid estoppel argument, but there is

12   something unseemly for the government to present one story to

13   a jury to get a conviction and then to shift, at sentencing,

14   to recast a case which was a single defendant into some sort

15   of conspiratorial group.

16       For those reasons, Your Honor, we don't think it's

17   appropriate to add those points.

18       Thank you.

19           THE COURT:  All right.  Let me make my finding on

20   this, and then we will proceed to the other issue.

21       I'm satisfied -- Well, first, the government argues that

22   an aggravating role enhancement under the guidelines is

23   appropriate because he recruited his sons as accomplices and

24   directed them to file false tax returns and apply for

25   mortgages and purchase properties in their names.

1        Under the guidelines and the case law that has developed,

2    a participant, in order to have this two-level adjustment,

3    you have to be an organizer, leader, manager, of one or more

4    participants.  "Participants" is the important word.  And

5    under the case law, a participant is someone who was himself,

6    or herself, criminally responsible for the scheme that

7    occurred.  And in order to find a participant is criminally

8    responsible, in the case of the *United States vs. Brinkworth*,

9    68 F.3d 633, a Second Circuit case -- the Ninth Circuit law

10   is similar -- the participant -- that is, in this case, the

11   government is arguing the sons -- must knowingly facilitate

12   the defendant's criminal conduct and not merely did so

13   unwittingly.

14       I'm satisfied here that the government has not met its

15   burden of demonstrating that the sons were themselves

16   participants in what the defendant has been convicted of,

17   namely, tax evasion.

18       The government, in its brief, argues that Scott Switzer

19   and Mr. DeGooyer were participants.  They haven't argued it

20   here.  So I will merely say that the evidence does not

21   support that conclusion.

22       But with respect to the sons, it appears, for the most

23   part, that they were unfamiliar with what the defendant was

24   really doing.  There's nothing wrong in putting a condominium

25   in the name of a son.  The question is whether they allowed

1  it to happen in order to facilitate the defendant avoiding

2  his income tax requirements or payments.

3      We learned during trial that, for the most part, the sons

4  were not familiar with what was happening in connection with

5  these very properties.  Neither son had any involvement in

6  the ANTO3 account.  Neither son testified they had any

7  involvement in the TRH account.  The defendant caused several

8  documents to be signed in the name of the sons without their

9  knowledge.

10     Clearly, the facts presented here don't support the fact

11 that these sons were knowing participants in the defendant's

12 decision to avoid taxes.

13     In my opinion, that two-point adjustment is not

14 appropriate, and I will not make it.

15     So the other adjustment that is at dispute here deals with

16 the obstruction of justice.  The government contends that the

17 defendant obstructed justice by committing perjury and

18 testifying falsely during trial.

19     Because I have tentatively indicated I believe the

20 government is correct and that the defendant did obstruct

21 justice, I will hear from the defense counsel first as to why

22 I should not impose that adjustment.

23         MR. ILLA:  Your Honor, in a typical case, an

24 enhancement for obstruction based upon a party's testimony at

25 trial is something that's relatively easy to figure out, and

1   that's because, often, the issues we deal with in court have

2   to do with simple facts, like possession of a drug or

3   committing an act of arson, let's say.  If someone takes the

4   stand and denies those things, in the face of the weight of

5   the evidence, it's often a very easy call after a jury

6   verdict against them.

7       Here, however, we have something that is far more

8   complicated.  Because this crime depends upon a mental state,

9   a state of mind that Mr. Hazelrigg claims was one way, that

10  state of mind was the essence of his defense.

11      I know that the jury rejected that defense, but that

12  doesn't necessarily mean that he wasn't telling the truth to

13  the best of his ability on the stand.

14      With respect to specific findings, we would request that

15  if the court does impose this particular enhancement, that

16  the court make all the proper findings as to particular

17  statements and why the court is holding that they were

18  perjurious under the circumstances.

19          THE COURT:  Well, the case you cited in your brief

20  does not require the court to do that, but I will certainly

21  make necessary findings.

22          MR. ILLA:  I wasn't suggesting the court wouldn't do

23  its job.  I was just trying to preserve the record.  I had a

24  case years ago where the judge made findings that were deemed

25  insufficient by the Ninth Circuit.  Not this judge, of

1    course.

2        Thank you.

3            THE COURT:  All right.  I don't need to hear from the

4    government on this subject.

5        Under the guidelines, Section 3C1.1, a two-point level

6    enhancement can be assessed under the guidelines if the

7    defendant testifies falsely while in a trial and willfully

8    obstructs or attempts to obstruct the administration of

9    justice.

10       In my opinion, that's what occurred here.

11       The predicate factual findings for perjury are that the

12   defendant gave false testimony under oath, it concerned a

13   material matter, and it was with willful intent to provide

14   false testimony, rather than some mistake or faulty memory.

15       In establishing falsity, I can consider what the defendant

16   said as well as the testimony of other witnesses.

17       I believe that the defendant testified falsely about

18   material matters.  The government, in its brief at pages 14

19   and 15, outline them.  Mr. Hazelrigg testified -- and he

20   testified along these lines on several occasions -- but that

21   everything, basically, he was doing was considered a family

22   investment or it was the children's money, Exhibit A, the

23   transcript, at pages 65 and 67, dealing with the ANT03

24   account.  He testified similarly with respect to the Milton

25   Lenders account.  He testified, with regard to the TRH

1    Lenders, that it was the children's money.  With respect to

2    One Lincoln Tower, he referred to it as family property.

3         Now, the evidence from the sons and from the exhibits

4    indicate, quite clearly, that the sons had no involvement in

5    ANTO3 or in Milton Lenders; that they did not invest in the

6    One Lincoln townhouse.

7         The defendant, in various documents that he prepared, that

8    came into evidence, demonstrated quite clearly he considered

9    that money and those investments to be his, and to the extent

10   he ran money through one or both of the sons' accounts, the

11   money quickly came out and went to where this defendant

12   wished the money to go.

13        I'm satisfied that his testimony was material to the

14   issues involved in the case, and I find that he willfully and

15   conscientiously, for the purpose of obstructing justice,

16   falsely testified on numerous occasions during the trial.

17        As a result, I'm going to assess the two points for

18   obstruction, and give you then a final -- I believe the total

19   offense level, for guideline purposes, is 26, criminal

20   history category I, the guideline range is 63 to 78 months.

21        Now, having made those findings, I'm not bound by those

22   findings, but they are certainly a starting point in

23   determining what is an appropriate sentence under all the

24   circumstances.

25        I will hear from the government as to what that is.

1          MR. DIGGS:  Your Honor, the government stands by its

2   sentence of 78 months for Mr. Hazelrigg.  And we don't make

3   this recommendation lightly or without significant thought in

4   this case.

5      When the 3553(a) factors are considered, that's the

6   sentence that's fair and just in light of those factors.

7      The defendant is an unrepentant tax cheat.  He undertook a

8   decade of deception, and his goal to hide assets pervaded

9   every aspect of his life.  The system that he manipulated and

10  evaded is a voluntary one, and when people cheat it, they

11  deprive everybody of their fair -- everybody is affected.

12     He negotiated a settlement for less than a quarter of what

13  the original IRS audit was, he signed a binding agreement for

14  that settlement, and he thought he could evade it, just the

15  way he had done with every other judgment he faced.  He was a

16  repo man, and the comatose IRS was no match for him.

17     So what did he do?  He used his special skills.  Now,

18  there is a guideline enhancement for the use of special

19  skills.  We didn't ask for it.  It's not appropriate in this

20  case.  But the defendant's knowledge of the real estate

21  industry, the banking industry, the escrow industry, asset

22  protection, in quotes, was used to defraud the IRS.  He

23  committed a fraud that the everyday man on the street could

24  not have done so completely.

25     Not only did he use his special skills, but he used a

1   legion of other people.  We have talked about the sons.

2   Many of the other people were witnesses at trial.  And

3   whether they were knowing participants in the defendant's tax

4   fraud or whether they are individuals who were, in fact, used

5   by the defendant, they were numerous.  The defendant used

6   friendly escrow agents and attorneys who were willing to

7   write checks for his deals to FRB, a company he wasn't

8   associated with.

9       He used a friendly banker, Wayne Lau, who he now wants to

10  go work for in a community-service role.  Mr. Lau turned a

11  blind eye when the defendant submitted an application for a

12  $9.5 million loan listing properties that he didn't have the

13  title for, and Mr. Lau knew this.

14      He used a friendly accountant, Scott Switzer, to fill out

15  K-1s, attributing millions of dollars to his sons.

16      He used a friendly lackey, for lack of a better word, Eric

17  deGooyer, who did whatever the defendant asked him to do.

18      Each of these people was financially beholden to the

19  defendant, and the defendant used them as part of his scheme

20  to defraud the IRS.

21      That's the offense conduct.

22      Turning to Mr. Hazelrigg's personality -- or excuse me,

23  his history and characteristics.  There's nothing in his

24  history and characteristics that supports a downward variance

25  from this guideline range.  Any analysis of his history and

1  characteristics needs to begin with his credibility, which I

2  submit to Your Honor is zero.  He lies when it suits him.

3  And the court saw that in the offense conduct.  The court has

4  touched on the obstruction.  The court saw that during

5  Mr. Hazelrigg's testimony.  He said what it took to get the

6  car, to get the good interest rate, to get the creditors off

7  his back, "because a lawyer told him so."  There was always

8  an excuse.  There were lots of excuses, there were lots of

9  lies, and they comprised a long time period.

10      What else about Mr. Hazelrigg?  He has, since the jury

11  verdict, completely refused to accept responsibility for his

12  actions.  There is no question that Mr. Hazelrigg does not

13  appreciate or accept responsibility for the crimes of which

14  he was convicted.

15      When he --

16          THE COURT:  He's gotten no credit on the guideline

17  calculation for that.

18          MR. DIGGS:  I understand that.  I understand that.

19          THE COURT:  So he doesn't have to accept

20  responsibility.

21          MR. DIGGS:  No, he doesn't, Your Honor.

22      But what he's going to do is pass the blame.  He's going

23  to blame the IRS, he's going to blame the prosecution team,

24  he's going to blame the witnesses who purportedly lied or

25  didn't understand what he was doing.  And when an individual

1   who has committed fraud as long as he did, and who lies to

2   the jury, and after the jury verdict continues to not accept

3   responsibility, that individual is at a higher risk of

4   reoffending.  The need to deter that person is greater than

5   someone who, even if they don't get the three points, comes

6   in and accepts responsibility.  That person is deserving of

7   the sentence recommended by the government.

8       The court is going to hear and the court has heard about

9   the defendant's health issues.  Your Honor observed --

10              THE COURT:  I have got a lot of papers.

11              MR. DIGGS:  You have got a lot of paper.

12      And you have got all of our observations from two weeks of

13  trial and two days of testimony.  We have got the declaration

14  from the one doctor in this case, at the Bureau of Prisons,

15  James Pelton, who was provided all of the records, with the

16  exception of the most recent letter from Dr. Pineda-Liu, the

17  March letter, and swore that BOP is going to have no issue

18  handling the defendant.

19      None of the medical records that the defendant submitted

20  suggests that the defendant has anything more than chronic,

21  stable medical conditions, which can be addressed anywhere.

22      Most pronounced are the defendant's medical conditions in

23  the letters of his friends, not in the letters of his

24  doctors.  He's manipulating the process by telling these

25  friends, and so we do see that, you know, people like Dan

1   Kirby, they are certainly aware that Mr. Hazelrigg has got

2   very serious medical conditions.  Well, I submit to Your

3   Honor that there's nothing in those medical conditions that

4   make a variance from the guideline range necessary.

5       I want to touch on the issue of deterrence.  Mr. Hazelrigg

6   has been and will continue to be a well-known businessman in

7   this community.  He made a lot of people very rich.  And, of

8   course, all of that money or most of it was lost.  And this

9   is not a factor in the sentence the government is asking for,

10  but what is a factor is the message that the court's sentence

11  will send.  It should be a message to people that are

12  considering this type of activity and the lawyers and the

13  accountants that advise them that there are significant

14  consequences, and that consequence needs to involve serious

15  jail time.

16      A felony conviction, supervised release, home detention,

17  these are nothing for the defendant or other people in his

18  shoes.  It's jail time that gets the defendant, and others

19  similarly situated, it gets their attention.

20      We addressed restitution in our memo.  I won't spend a lot

21  of time talking about restitution, other than to point out

22  what we did in the memo, which is, the defendant's argument

23  that he needs to be out in order to repay restitution

24  strikes, frankly, an offensive chord, because he is

25  continuing to try to manipulate what this court does and the

1    sentencing process to his advantage, to avoid what is a just

2    punishment.

3        Now, the defendant has attached a number of documents to

4    his sentencing memorandum for allocution.  There's a picture

5    of him in a medical bed, there is a picture of a football

6    field with some judgments, and a memorandum about Oasis

7    funding.

8        I don't know what arguments he will make about these.  I

9    know he won't accept responsibility.  I suspect he wants to

10   relitigate certain defenses that were wholly before the jury

11   and wholly rejected by that jury.  I think we're going to see

12   him throw a bunch of stuff at the wall to see what sticks.

13   And the way we get to the bottom of these arguments, when we

14   actually look at the facts, when we run down what he files,

15   they only further support the sentence the government is

16   asking for.

17       A couple of pertinent examples.  The judgments that

18   Mr. Hazelrigg talked about, that they touched on, that is in

19   my memorandum.  Those judgments were all assumed by Mike

20   Mastro.  There's no evidence that they had any real effect on

21   the defendant during the period of the tax assessments.

22       To take one example, the judgment the defendant says was

23   $1.1 million, it's actually $100,000, because property was

24   sold.  He's not being honest in what he's submitting.  It's a

25   shell game that the defendant and Michael Mastro conducted

1    for many years.  They moved money around to keep it out of

2    the purview of the IRS and other creditors.

3        The vehicles.  The defendant submitted paperwork showing

4    four vehicle VIN numbers.  We ran down those four VIN

5    numbers.  The defendant was the registered owner of one of

6    the cars during the period of the tax assessment.  He was the

7    legal owner of none of them.

8        The notices to the IRS.  I think there's still going to be

9    an argument that the IRS is to blame here for not piercing

10   his web of nominee companies and property ownership.  Well,

11   he showed some gambling income, Your Honor.  Not one of his

12   tax returns ever showed any gambling income.  So by his own

13   returns, any income he made from gambling was completely

14   canceled out.  But the other tax returns he submitted showing

15   gross income, not one of the returns showed a dollar in

16   taxable income; he paid no taxes in 2004; and any taxes in

17   2005 and 2006 were the alternative minimum tax and the

18   self-employment tax.

19       Now, the defendant was making millions and millions of

20   dollars during these years.  He had to report something.  But

21   what he reported to the IRS showed that he owed nothing,

22   because he knew from his experience that that was what

23   mattered, what assets do you have.

24       I'm not going to address the prosecutorial misconduct

25   claims, other than to say that they're baseless and that they

1    are not relevant to a single sentencing consideration.  If

2    the court would like a response from the government following

3    the allocution or if any actual arguments from the defendant

4    would affect the court's sentence, I would ask for an

5    opportunity to respond.

6         Your Honor, if the court follows the government's

7    recommendation or gives a term of custody in this case, we

8    are asking for remand at this time and here is why:  The

9    stakes keep rising for Mr. Hazelrigg.  In his ignorance, he

10   did not believe he would be facing jail.  If he is, things

11   have changed for him.  He submitted documents to the court.

12   The first page of his exhibit states that a sentence of

13   incarceration is a death sentence.  He does not have a

14   recommendation for any sort of procedure or surgery, which

15   was the reason we did not ask for remand earlier.  In fact,

16   the most recent medical report from Dr. Pineda-Liu indicates

17   that his condition has improved and it is stable.

18        A number of wealthy friends have written letters.  It's

19   clear that Mr. Hazelrigg has access to these funds, and

20   flight is a concern and non-appearance to serve any sentence

21   is a concern.  If the court imposes a custodial sentence, we

22   see no reason why he should not be remanded today.

23        The court observed a two-week trial that culminated with

24   the jury convicting Mr. Hazelrigg of tax evasion.  He lied to

25   that jury.  And after they saw through his lies, rather than

1    accept responsibility, he has continued with manipulation of

2    the court system through the sentencing process.

3        The court's sentence has been long overdue for

4    Mr. Hazelrigg.  This day is long overdue.  And the government

5    encourages the court -- urges the court to sentence the

6    defendant to 78 months and to remand him today.  Thank you.

7             THE COURT:  Thank you.

8             MR. ILLA:  Your Honor, it appears that probation and

9    the government are at odds on one issue that I will discuss,

10   and that the government is also at odds with pretrial

11   services, Supervising Officer Tom Fitzgerald, on another one.

12   I will take those issues first.

13       In terms of a remand, the government today decides that

14   Mr. Hazelrigg is a flight risk.  I listened to the reasons

15   for that.  It doesn't sound like anything new has happened.

16   It doesn't sound like the pretrial services officer shares

17   those concerns.  His report recommended self-surrender.

18       On a bigger issue, though, I believe that the demand for

19   immediate remand reflects a mindset of wanting to punish

20   Mr. Hazelrigg for exercising his rights, in some respect.  I

21   was struck by the whipsaw nature of the suggestion that by

22   asking for the opportunity to be out and repay restitution

23   ordered by the court, that somehow this was evidence of a

24   lack of responsibility.  I suppose what the government would

25   argue if he hadn't made that suggestion was that he doesn't

1    accept any responsibility and makes no plans for restitution.

2    I don't expect the government to give Mr. Hazelrigg a fair

3    shake in terms of its analysis.  We are advocates.  But some

4    of the statements made with respect to his health condition,

5    I believe, are indicative of this avidity to punish.

6        The government asserts in its sentencing memorandum that

7    the defendant's medical history is "not well outside the norm

8    for an individual his age."  There's no citation to any

9    authority.  So I must assume this is the diagnosis of

10   Dr. Diggs.

11       What's it based on?  Well, in the next sentence, there's a

12   reference to the defendant's active participation in two

13   weeks of trial, "eight hours of testimony."  There's an

14   assertion that Mr. Hazelrigg's stamina matched that of any of

15   the other participants.  I didn't realize we were having a

16   competition, or I would have demonstrated more vigor to

17   contrast myself with him.

18       The government also asserts, "The defendant is neither

19   frail nor ill."  And, again, no citation to authority.  Are

20   these doctors treating him for nonexistent conditions?  Are

21   the recommendations regarding his risk for stroke made up?

22   Has he manipulated the medical people somehow?  Or is this

23   simply another example of assertions unsupported by the

24   record, designed to put this man in prison for a longer

25   period of time?

1        I believe that any fair review of the defendant's medical

2    records would lead one to conclude that he's a sick, old man;

3    that he requires a great deal of medical care; that he

4    suffers from progressive, insidious deterioration.  I don't

5    know, frankly, whether or not the Bureau of Prisons can

6    actually take care of him to the same extent private medical

7    people could.  But, of course, that's not the issue.

8        The issue is, what's appropriate for him.  And in that

9    regard, I would urge the court to also consider the societal

10   implications of putting him away for an incarceration term.

11   Because as Mr. Diggs talked about in terms of evading taxes

12   and not paying it, we're all paying for the medical care of

13   inmates; we're all paying for those operations.  The court

14   ought to take that into consideration too.  The amount of

15   money needed to take care of someone as sick as Mr. Hazelrigg

16   is quite significant, far beyond what's calculated in, say,

17   the probation report.

18       The last issue, Your Honor, has to do with restitution.

19   And at trial, I believe the evidence was quite clear that all

20   of the income that Mr. Hazelrigg was alleged to have diverted

21   was diverted to people who did pay taxes on that income.  We

22   saw the five -- I'm sorry, we saw the K-1 forms.  We saw the

23   tax checks sent to the sons to pay for those taxes.  So in a

24   very real sense, the IRS itself doesn't appear to be out

25   anything.  I'm not arguing that this affects the calculation

 1    of loss under the guidelines, because I believe that the

 2    offense doesn't require an actual loss.  However, with

 3    respect to ordering restitution for this man, it seems to me

 4    he ought to be entitled to some degree of offset.

 5    Restitution is designed to put victims back where they were

 6    without the offense, rather than give a windfall to those who

 7    have been affected by the defendant's alleged crime.

 8         Thank you, Your Honor.

 9              THE COURT:  Does your client wish to be heard?

10              MR. ILLA:  Oh, yes, Your Honor.

11              THE COURT:  Mr. Hazelrigg, you can make a statement.

12    Please use the podium, if you would, please.

13              THE DEFENDANT:  I have got --

14              THE COURT:  Go up there.

15              THE DEFENDANT:  Can I hand you a piece of paper and

16    then -- Oh.  This is a more --

17              MR. ILLA:  You have to talk from the podium.

18              THE DEFENDANT:  -- current piecing together of

19    medical reports.

20              THE COURT:  Go to the podium, please, and use the

21    microphone.

22              THE DEFENDANT:  Yes, sir.

23         You will have to excuse me, Your Honor, because I might be

24    long-winded because I consider this my life on the line right

25    now, at the age of 68, turning on to 69.  I have got a lot of

1   good information, I think, that I think the court needs to

2   hear.  And if you will bear with me.  If you need a break at

3   some point, let me know.

4       But I just want to start with my intent and state of mind

5   in this whole situation.  Let me go back to the old adage of

6   the poisoned-tree theory that I have had, that I entered into

7   a settlement agreement based on -- and you will see in the

8   papers that I just gave you, where -- I think you got those

9   last week -- where I get an opinion letter from an attorney

10  that tells me you don't -- I just sent you -- I just handed

11  you a piece of paper that shows a 1991 tax return that was --

12  if we could look at that, I marked it Exhibit C-49.

13      And if you look at C-49 -- Do you put these upside down or

14  how do you --

15              MR. ILLA:  Face up.

16              THE DEFENDANT:  Up.  Okay.

17              THE COURT:  I'm going to look at the hard copy.

18              THE DEFENDANT:  This, because of lack of having the

19  tools or the --

20              THE COURT:  I have got the hard copies that I can

21  see.

22              THE WITNESS:  Okay.  So let's just take a quick look

23  at this, and you will see my intent and state of mind and how

24  we got where we are at.

25      This is an amended tax return for '91, which was the year,

1  with bells and whistles, the government is saying I owe them

2  $440,000.  And Dawson Taylor -- I am sure you have heard of

3  that name in town -- is a very well-respected tax return

4  attorney.  He says, under penalty of perjury, that, for 1991,

5  he added 800,000 more of income, and I owe the government,

6  for 1991, $2,719,000.  So that was the situation until I get

7  a call from a party in Oklahoma, where I had a small

8  apartment complex, saying that they got a notice that there's

9  a tax lien from the government for, at the time, it was four-

10  or five-million dollars, whatever the number was.  And that

11  was based on not an audit of mine, but it was based on an

12  audit of Mr. Mastro, who was my 50-percent partner in the

13  Oasis Water Park.  I was rather shocked, and I wasn't in the

14  best financial condition at the time.  I believe I got that

15  notice around 1993.  And so I went ahead and hired an

16  attorney, Dawson Taylor, and started with him the process of

17  appealing it.  I got through the process to a certain point,

18  and I ran out of money.  I got a letter from him:  You owe me

19  six months' worth of bills.  You need to give me a retainer

20  and pay up.

21      My mindset at the time was, I know this is an error.

22  Mr. Mastro paid off a six-and-a-half-million-dollar loan that

23  was on the water park, and they took it as income.  It was a

24  complete government error.

25      And one of the reasons that I didn't do the trial the way

1   we wanted to do it, which is going back to the real source of

2   my problem, was the absolute spoliation of records.  The

3   government sits there, and I'm requesting, forever, "May I

4   have Mr. Mastro's transcripts?"  Because, in 1998 -- this is

5   very important to my intent and my innocence here -- he calls

6   me and says, you have nothing to worry about, your settlement

7   with the government that you did when you ran out of money,

8   because they were wrong, and there are no changes, and you

9   should be able -- you could go on with your life; you don't

10  have to worry about it anymore.

11       So with that information, along with the outline of

12  arguments which I have given you that I was relying on, from

13  a very good attorney that, at the end, says, because the

14  examiner incorrectly attributed nearly all of the funds

15  invested in Oasis as loans made by Mr. Mastro instead of as a

16  50/50 investment by taxpayers, you don't owe the money.

17       The bottom line was, I ended up losing millions of dollars

18  over time because I had guaranteed six and a half million of

19  that project.  I'm sorry.  It was 5.6 million of that

20  project.

21       And if you look at the short history on the project, which

22  was taken from a Google search, the project sold, in 2001,

23  for 9.1 million.  All the testimony was that it was built for

24  about $11.2 million.

25       So from day one, I was told by Mr. Mastro, hey, don't

1  worry about it; you can get on with your life.  I was going

2  to then just deal with four other judgments I had.

3      As far as the government's lien, I was not concerned about

4  that anymore.  And until I get indicted, I hadn't even

5  thought about it.  Mr. Mastro is gone.  But all his records

6  were taken over by the trustee in the bankruptcy court.  And

7  I said to the government, will you get me copies, please, of

8  Mr. Mastro's '89, '90, and '91 tax returns, which will show

9  that Oasis Water Park has a huge write-off for me because of

10  the interest expense that I was paying Mastro and the fact

11  that it lost money.  It was a loser project.  You have

12  winners; you have losers.  I never made a dime off of that.

13  They will never find where I received one penny from that

14  project.  And that's why I'm here today, because of the Oasis

15  Water Park's false tax return that -- tax audit that was done

16  by the government.

17      Why didn't the government bring the guy that did the

18  audit?  Is he dead, that did the audit?  Is he dead?  He must

19  be dead, because he's the one that could have told me --

20  testified that, yeah, we did the audit and we were wrong.

21      So I have got a myriad of issues.  I have got a partner

22  who calls me a year later and says, it's over, don't worry

23  about it.  And, unfortunately, I had always relied on

24  accountants and attorneys to do the money part of my life.

25  And I relied on that.

1    So when I get indicted, I ask the government, please, help

2    me, I need documents.  I know they have Mr. Mastro's

3    documents.  They lie.  They sit there.  They cheat and try to

4    throw me in jail and say, we don't have his tax returns.

5        I know right now that if Tom Kenyon were to go to the

6    warehouse where they have all of Mr. Mastro's papers, they

7    would find his tax returns.  They would be sitting there in a

8    box.  He was meticulous at keeping all of his little boxes.

9        They have got his tax returns.  They wouldn't give them to

10   me.

11       So then on November 26th, which I have set as an exhibit

12   on prosecutorial misconduct, on November 26th, he writes them

13   an e-mail and says:  Please get us Mr. Mastro's transcripts.

14   Which the transcripts -- which you, by now, have seen and

15   looked at -- guess what they said?  I'm taking a high risk

16   asking for this.  I'm saying, right before trial, hey, am I

17   insane?  Didn't Mastro say that, on all of his audits, there

18   was no changes?  Now, I can pull those out and show them to

19   you, that every one, '89, '90, and '91, they had auditors

20   with him for two or three years, and it says zero changes.

21   And if you were to look, I can give you those items on the

22   screen, if you would like.

23       THE COURT:  I have looked at all the documents you

24   have submitted, Mr. Hazelrigg.  You don't need to show me.

25       THE DEFENDANT:  Okay.  Well, this is what I'm most

1   concerned about.  How would you like to be in my shoes and,

2   on November 26th, you are notified through your attorney

3   that -- I would like the transcripts.  It's important to my

4   defense.  We were going to start our complete case based on

5   the fact that I didn't owe the money and that I should have

6   had a refund of about $2 million in that year's tax return.

7   So Diggs responds, "We have a call and an email into the IRS

8   counsel's office to determine the process ... to obtain these

9   transcripts ..."

10      Now, I know now they were sandbagging me, because when you

11  did the court order, I believe it was around December 3rd --

12  Do you remember signing the court order that they had to get

13  me my transcripts?  Okay.  My trial had just started, and it

14  was important for me to get those in front of the jury, the

15  items that -- that Mastro transcripts are saying, "Additional

16  tax assessed by examination," zero, zero, zero.  Every one

17  across the board.  I can put them on the screen.  But it's

18  very clear that all of his audits ended up zero.  And he had

19  a lot of things on his tax returns.  But if he has zero

20  changes, that means the Oasis has zero changes.

21      And instead of -- So what do they do next?  They --

22  Finally -- that was on the 3rd -- on the 4th, they push a

23  button.  That's all they had to do, was just push a button.

24  But you guys don't want to do that.  You want to cheat.  So

25  what do they do?  Instead of getting me what was important to

 1   my defense -- whether you think it has value or not, it was

 2   very important to me -- they withheld the items.  And when I

 3   get them, if you notice, the date is December 4th that they

 4   received them.  And if you look here, it says, "Request

 5   Date:  12-04.  Response Date:  12-04."  Push a button.  And

 6   instead of telling me, on November 26th, oh, we're starting

 7   the process with the attorney for -- They're the DOT.  They

 8   can push a button and get anything they want.  They

 9   completely lied to me and lied to my attorney.  And now, on

10   the 4th, they had it.  If they had given it to me on the 4th,

11   I could have said:  Jurors, look at this.  Here is, absolute,

12   my 50-percent partner in the Oasis Water Park where there was

13   a 3-million-plus swing from not owing money to suddenly owing

14   money on the audit and now there is no money owed.

15        So what did they do?  The trial is almost over.  If you

16   look at this document, I believe there's an Anna Chang who,

17   on November 9th, at 10:29, sends "Please see the attached

18   Mastro Tax Return Certificates."  Okay.  I am so upset.

19   We're in a room over there, having lunch, and Stephan opens

20   his phone and says, oh, my God, they have had those documents

21   since the 4th, and now -- they don't walk over and hand them

22   to us -- do we have a printer here, a computer, do we have

23   any ability to even get them printed out, to try to get them

24   into testimony?  No.

25        So they cheated.  They sandbagged me.  And it's about the

 1    most upsetting thing I have ever heard, a prosecutor pulling

 2    something like this.  Five days.

 3        He says, oh, just don't even worry about the prosecutorial

 4    misconduct.  That is about as livid as, I would think -- I

 5    know I am; I hope you see it -- because I -- Stephan will

 6    tell you -- that's about the most upsetting thing I have ever

 7    seen.  Something I have been asking for since November 26th,

 8    they withhold it.  So for them to scoff at misconduct?

 9        And then I can go on.  There's something very important to

10    me, because I'm old school.  When I went to college, they

11    didn't have computers.  When I first -- And this is the

12    truth.  When, a year ago, somebody says you are going to get

13    a thumb drive from these guys.  One set of documents had

14    179,000 pages on it.  Another one had who knows how many

15    hundreds of thousands of pages on it.  I said, well, they

16    illegally seized, the trustee, Mr. Scott Henry's

17    company/firm, seized 20 boxes of my records about a year and

18    a half before trial.  I had my first set of attorneys ask for

19    them.  It just got ignored.  We finally, coming near trial --

20    I like to look through the boxes and see what I can find.

21    I'm not a soft drive -- I live with a little iPad.  That's

22    pretty much -- We're kind of shorthanded here.  He lives on

23    an island, and we don't have a war room where we can sit down

24    and have documents.  So we rely on these guys being honest

25    with us, not cheating us and not withholding transcripts,

1    which, to me, is lifesaving.  It almost makes me cry, when

2    you look at this.  And every one of them, '89 through '91, my

3    partner -- And the only reason that I'm here today is because

4    I got hit with something unjust, an audit that I had to

5    settle because I ran out of money.  But my partner calls me

6    and says, in 1998, which is right here, hey, it's over, you

7    win.  So what do these guys do?  They give it to me five days

8    later.  It's too late.  Had they given it to me in November,

9    we would have set our case all about the real nutshell of

10   this case, which is the Oasis Water Park and the change.

11   And, luckily, I found my '91 tax return.  Do you think they

12   were going to give it to me?  Here's my '91 tax return, and

13   it's signed by Dawson Taylor.  I've got 2.7 million worth of

14   losses.

15       So I'm just finishing with my intent, and how disturbed

16   that I am with this type of -- what these guys have done.  I

17   know they hate me.  I'm not to be hated here.  You will find

18   a lot of people that have really high respect for me.  But

19   these guys were really after Mastro.  That's what it's all

20   about.  I am collateral damage.  That's exactly what I am.  I

21   have been approached.  They got ahold of my attorney -- and

22   I'm going to say this because it's my life on the line -- and

23   they say, hey, if you can get Mastro out of France, as if I'm

24   his best buddy -- I haven't talked to him in years -- get him

25   out of France, all this will go away.  Get him across the

1   border, get him somewhere.  I get a call from the attorney,

2   and I says, I'm not going to do that.  That's crazy.  That's

3   just not who I am.  I'm not going to go into Italy and

4   convince him to come over and maybe have a bag full of money

5   for him and they're going to arrest him.  I have been offered

6   that.  They lost Mr. Mastro.  Now they want to make me the

7   scapegoat because I never went in and talked to them.  I wish

8   I had.  I wish I -- Five years ago, a good friend says, well,

9   just forget the attorneys, you have got nothing to hide, go

10  meet with the government.

11      Well, I'm still upset to this day.  It makes me crazy when

12  they hold papers for five days.  And from November 26th, this

13  case would have been completely different if they had been

14  honest.  And they're not.  And they sit up here and say lies

15  and lies and lies about me.  They're saying I'm a liar.

16      The issues here -- I'm going to now switch to my attitude

17  about taxes.  It's not what they're saying.  I'm going to

18  give you a few examples.  Remember when Parris Broderick came

19  in here and Parris said, yeah, there was a time when I

20  couldn't pay my taxes?  What did Mr. Hazelrigg do?  I didn't

21  say, Parris, let's find a way to cheat.  Oh, I really like

22  you; I will just pay you in cash.  I said, Parris, you've got

23  to pay your taxes.  You've got to do the right thing.  I gave

24  him a check for $90,000.  You remember that testimony?  He

25  was the, quote, butler guy.

1    Okay.  And, also, while we're on that subject, I can look

2 you in the eye and say that every dollar that I ever spent

3 was aftertax dollars.  Yes, it was some of my children's

4 money.  But I'm not allowed to get money from my children,

5 aftertax dollars, that do real estate investments?  There was

6 no way I was doing those to hide from the government.  When

7 we go into the government, they did zero collection action.

8 In 2000 -- There's a guy up there that testified, this is the

9 Hazelrigg collection file, Your Honor, and it went over here,

10 it went in the wastebasket.

11    During the period from 2000 to 2007 -- this is not a

12 joke -- when my daughter, as wonderful as she is, came up

13 with this:  Dad, this is what really happened, my little

14 football scene, because it's a game.  And to evade, which I'm

15 being charged with, one would assume you would have another

16 player on the field.  This player was asleep.  You guys were

17 asleep.  You didn't do anything.  The right arm didn't know

18 what the left arm was doing.

19    So here we have income.  That's real money I got.

20 $4.2 million -- you have seen these before -- of cash flow

21 that I showed on my tax returns.  No.  But the question is,

22 if it was 10 million or 12 million, and I paid maybe only

23 2 and a half million in taxes, where my children ended up

24 paying 4 or 5 million in taxes at the highest rate, they were

25 paying 38 percent, and for them to say the kids had nothing

1    to do with the company, that is absurd.  You have a letter

2    from Scott Switzer, and he testified.  T.R. brought us 8

3    million dollars' worth of business.  Bill Barquette and

4    Martin Selig -- I was not doing business with Martin Selig.

5    He was trying to borrow from my son's company, so he'd come.

6    And T.R. brings us $8 million.  He wasn't there every day,

7    but he had a lending business where all he did was

8    first-position loans and office loans.  He had tons of people

9    come in wanting to do land loans or seconds.  He would sit at

10   that desk.  He sent us a guy named Bill Barquette.  We made

11   over $8 million in fees with T.R.  He was underpaid.  He

12   didn't get paid enough.

13       And then Aaron guaranteed a tremendous amount.  He was on

14   the hook for 100-and-some-million dollars.  And I can show

15   that to the court, if you want to.  But he was on the hook.

16   He was doing all of the office buildings.  And they're saying

17   I'm hiding.  Well, read this.  I am trying to hide from the

18   government.  Well, first of all, there's nothing to evade.

19   But if you look at the article, it says, "Centurion makes

20   waves in real estate."  This is in 2006, in the early part.

21   Look at what my son announces on the second page.  Or I got

22   it the wrong way.  I'm sorry.  But he says, "Major investors

23   include Hazelrigg's father."  Where am I hiding?  Who am I

24   evading?  Is it a phantom?  Because if you look at the

25   history on the government, they never -- Look at these

 1    documents.  This is how much correspondence I gave to them

 2    through -- This is in 2005.  Rob McCallum contacts, Rob

 3    McCallum contacts, on 7/5 of '05.  Here is more

 4    correspondence with him.  Here is more correspondence with

 5    him.  They had 100 pages from casinos.  I gambled.  Yes, I

 6    did.  And I didn't keep track of my winnings or losses.  It

 7    was pleasure for me.  It was something I was good at, I

 8    thought.  And whether I won or lost, it didn't matter.  It

 9    was something that -- I relaxed and I enjoyed the numbers

10    part of it.  But here the government, if you look at the

11    bottom of this page, it says "IRS."  They had a set this

12    thick of me being active and items going to them.

13        But, again, in 2000, you guys took my collection part.  I

14    could have had 20 homes in my own name, if I could have

15    afforded that.  And it wouldn't have mattered, except I

16    couldn't buy a home.  Every real estate purchase that was

17    made, you can't own real estate when you have outstanding

18    judgments.  I had five of them.  They scoff at those.  Mastro

19    didn't buy all of them.  There's one that even got settled in

20    2007 for $100,000.  It had nothing to do with Mastro.  But I

21    had, as you see in this picture here, I had five people

22    chasing after me every day and -- not every day, but they

23    had -- And one of them, I didn't know, had been paid down.

24    The Penner one, I guess, got paid down to $100,000.  But,

25    still, I'm here trying to do things with my family.  My

1   family has done things together forever.  When Aaron first

2   got involved in real estate, it was through me, and we did it

3   together.  He had the credit.  I had an investor that bought

4   our first office from him.  He would show him these offices

5   that were involved.  We weren't hiding that I had a -- I had

6   a profit-sharing agreement.  If the building sold, for

7   putting the deal together -- Aaron had to put up the

8   credit -- I would get a percentage of the profits down the

9   road when it sold.  That property refinanced once, and

10  6 million came out, because it had appreciated so much.  I

11  had money to live on.  It was more than the 4.2 million,

12  which is cash flow.  If a property -- If you are a developer

13  and you refinance, if you refinance your house, it's a

14  nontaxable event.  And everything that I did, with the

15  intent, is about doing the honorable thing when it comes to

16  taxes.

17      But let me go back to the tax one.  I gave you the example

18  of Parris Broderick.  You know him.  The other gentleman that

19  came on the stand here, which is going to show you what a

20  good guy I really am and how adamant I am about paying taxes,

21  Jon Eric deGooyer.  You probably remember him on the stand.

22  Okay.  I love the guy.  He's a procrastinator.  He's very

23  intelligent, but he can't get from A to Z.  So when he gets

24  broke in life, he comes and sees me and I give him a job.

25  Sometimes we don't get along and he goes, but he always comes

 1    back.  So Eric came to work for Centurion.  Mr. Generous

 2    Friend, and with Scott's permission, he ended up getting 13

 3    percent of the company.  In two years, he made $4 million.

 4    I go in his office and say, "Eric, have you done your tax

 5    returns yet?  You've got to do your tax returns."  "No."  "So

 6    when was the last time you did a tax return?"  "Oh, I don't

 7    know.  10 or 15 years ago."  I said, "Are you kidding me?

 8    You are not going to be working for Centurion unless you pay

 9    your taxes."  So what do I do next?  And I have got

10    witnesses.  Scott Switzer will tell you I did this; Daniel

11    Smith will tell you I did this; my daughter, sitting right

12    there, will tell you I did this.  I forced him into his

13    office.  I said, "You are going to pay your taxes because

14    that's what you do."  I believe in paying your taxes.

15        Now, excuse me, I had my kids pay taxes on money that you

16    say they shouldn't have had?  You got it at 38 percent.

17        I'm a developer.  I had lots under construction during

18    this period.  Like I say, I had more than I could ever dream

19    of.  And I could have taken -- I didn't believe at all that I

20    had an issue with the IRS anymore.  There's no evasion.

21    There was no player on the field.  There's not one, other

22    than them sending an annual notice that they're pretty good

23    at, and sending me, which is kind of interesting -- it's in

24    your records here -- they send me a notice of default that

25    they're going to execute.  That was for 9,000-some dollars.

1   Have you seen that document?  Okay.  What did I do?  Within

2   ten days, I send them a cashier's check.  I paid it.  And

3   they say that I don't pay.  And then the first part of 2007,

4   I sent them a 50,000 estimate.  I didn't ever believe that I

5   owed that tax.

6       And yes, with my kids, I was the father, and we used to

7   joke with my son, "You're it, you're the father now."  And

8   when I started losing everything in 2007, I stepped down and

9   said, okay, T.R., you are the head of the family now.  We

10  were a family.  We did things together.  We all loved Palm

11  Springs.  We wanted homes in Palm Springs.  Yes, I lived in

12  those homes.  Yes, when the economy started going bad, I

13  started trying to refinance and get them out of harm's way.

14  That's what you do as a father of your kids.  I rented the

15  homes.  They paid taxes on that rent.  And it was legitimate.

16      And I couldn't own real estate.  You can't own real

17  estate.  You can own cars.  If I was able to look up all my

18  cars from 1997 to 2007, I have had cars.  They're worth a lot

19  of money.  They had no debt.

20      They're asleep over here.  Are you guys waking up now?

21  Okay.  Because there's nothing --

22          MR. ILLA:  Excuse me, Mr. Hazelrigg.

23          THE WITNESS:  I'm sorry.

24          MR. ILLA:  You have to confine your --

25          THE COURT:  I think that's inappropriate.

1    Mr. Hazelrigg --

2             THE DEFENDANT:  I'm sorry, but I'm really upset.

3             THE COURT:  I understand you're upset.

4             THE DEFENDANT:  I apologize.

5             THE COURT:  But you need to give me some time to

6    decide how --

7             THE DEFENDANT:  Well, they point at me and accuse me

8    of all of this stuff.

9             THE COURT:  Mr. Hazelrigg --

10            THE DEFENDANT:  Yes.  I will --

11            THE COURT:  -- see if you can reach the end zone here

12   and wrap it up.

13            THE DEFENDANT:  I'm sorry.  What?

14            THE COURT:  I say I want you to focus on what you are

15   going to have to say to me.

16            THE DEFENDANT:  Okay.

17            THE COURT:  And see if you can end it soon.

18            THE DEFENDANT:  Yeah.  I apologize for being

19   emotional.  But there's two sides to every story.  I'm sure

20   you have heard that.

21       Okay.  I could go -- You know, the Hoss testimony,

22   where -- I finally got copies of the checks on the Hoss

23   testimony of all of this money that I was supposedly hiding.

24   And if you look at the $200,000 check, the borrower was Gene

25   Horbach, okay?  Gene Horbach and I had not talked till the

1   early '90s, when -- I gave you that article -- where I say,

2   "All I ever hear from Gene Horbach is, 'I think I am going to

3   have to kill you,'" because I've collected for some of my

4   clients against him that he owed money.  It was not my loan.

5   He was partners with Mike Mastro.  Mike, many times, would

6   say, Tom, would you go pick up a check, or handle this for

7   me?  Because I wanted to be in good favor with him, I would

8   take care of running things around.

9        The next check is a guy named -- Selig Real Estate, and

10  that one is for $140,000.  Again, that isn't me.  Mike Mastro

11  was good friends with Martin Selig for years.  And Selig

12  would borrow money from him.  I only started doing business

13  with Selig, again, after my son sent him to us in the

14  2003/2004 range, where we were doing loans.

15       These were not my monies.  And they tell the jury that I

16  took this money and I hid it.  The only reason FRB was ever

17  used for those accounts:  Anne Stockton.  Anne Stockton

18  worked for Mike Mastro for years, and she felt comfortable

19  that she could have all of our monies as a group.  If I were

20  to take a check individually, guess what would happen?  I've

21  got four other creditors.  I can't have a checking account.

22  They even testified that I had a checking account.  Do you

23  know whose account that was, that they garnished in

24  1997/1998?  It was my daughter's.  When she was 18 years old,

25  I had to sign, and probably her mother signed.  She was a

1   student at the University of Washington.  The one effort the

2   government ever made, they took money, because my social

3   security number was on there for my daughter, who had been

4   working three jobs.  Because that's how I raised my kids, to

5   work.  Tully's was one of them.  But that was her 1,500-

6   and-some dollars and not mine.  I never had any checking

7   accounts.  I had four other creditors I was dealing with.

8   And I considered this one a non-event.

9       And if they had cooperated and gotten me Mastro's tax

10  returns, which I still know they have in a box somewhere in

11  the warehouse -- And it would be nice if they would ever

12  return my twenty boxes of records, which they admit that they

13  have no right to them.  They sent a subpoena down to Scott

14  Henry's office for Centurion records.  It wasn't a search

15  warrant.  And yet they would never give me back what I needed

16  to defend myself.  It's really upsetting.  And there were

17  twenty boxes.  And they said, well, there's a soft -- or a

18  flash drive or there's something you can see yourself.

19  That's not the way -- I use the boxes.  I like to pick out a

20  file and then use it in my defense.  I wasn't allowed to do

21  that.

22      The entire case is a unique case, Your Honor.  It's not

23  the typical case.  It's not where a guy just didn't file his

24  tax returns so he's going to get five or six years.  It's not

25  about that.  I filed my tax returns.  I was late sometimes.

1   Mine were complex, and I had to have a lot of money when I

2   did it.  But I would go up and down.  I'm a risk taker, I'm a

3   spendthrift, I'm a lot of bad things, but not a tax cheat.

4       And so you look at the spoliation here.

5       And I have tried to research it.  In the history of the

6   government, these are more than 26-year-old taxes.  I have

7   never heard of such a thing.  And the reason I haven't heard

8   about it and the reason the numbers get so high is, along the

9   way, they sandbagged me again, and said, hey, we would like

10  some tolling agreements.  Well, why do you need tolling

11  agreements?  They said, well, we just were working towards

12  not having you convicted, and we just need a little more

13  time.  Again, not telling the truth.  So I go ahead and I

14  sign a fourth tolling agreement around June 9th of 2013.  And

15  they have this excuse -- and I gave you a copy of the

16  e-mail -- Susan Loitz has to work on probate, for her mother

17  had died.  Well, you don't work on a probate.  You get a

18  probate attorney, and it happens -- it takes an hour out of

19  your life, or two or three hours.  They had three other

20  attorneys probably working on this case.

21      They really, in essence, felt that I was the key to Mike

22  Mastro.  You know, here is the big guy.  I was the little guy

23  who is going to rat out the big guy.  There was nothing to

24  rat out.  The last -- From two thousand, probably, three, I

25  maybe talked to him once a month.  I was not an associate.

1    They do -- All the press releases, Hazelrigg is the associate

2    of Mr. Mastro.  It wasn't about me.  Start looking at all the

3    press releases in all the newspapers, it's about Mastro and

4    me.  I liked Mike.  I didn't like his wife.  And Mike had

5    done me a favor when I was -- in 1983, helped me through a

6    divorce, so I could buy up my first piece of property.

7        But Mike was wrong in what he did, evading, leaving for

8    France.  That's not me.  My family is here.  I'm going to

9    stay here.  And I'm going to fight this, if it has to be an

10   appeal or whatever else.

11       But I want to take care of one thing.  And I'm going to

12   make an offer to the court right now, that if I'm left out, I

13   will have to prove to you that I mean business about

14   restitution.  I plan on going to friends -- not family

15   members -- to friends and borrowing at least the principal.

16   This whole case is over a 280,000 principal balance.  How can

17   I be looking at six and a half years?  Which is a death

18   sentence for me.  I will go into the medical part last.  But

19   the bottom line is, I would say, okay, Your Honor, you want

20   to give me two years, or whatever you come up with, and I can

21   start making restitution and show that, hey, the jury

22   convicted me, my hands were tied, a two-man shop against a

23   30-man shop; I'm finding evidence later, such as the checks

24   from Hoss, which they didn't show me when I was sitting up

25   there.  That's just not fair.

 1      And the spoliation issue --

 2          THE COURT:  We have heard about the spoliation.

 3  Let's move on.

 4          THE DEFENDANT:  What's that?

 5          THE COURT:  I said, let's move on to what you want to

 6  talk about, your health condition.

 7          THE DEFENDANT:  Okay.  I just wanted to add that Anne

 8  Stockton, my accountant, died, who knew everything.  Randy

 9  Tanner, who had been my CPA, ended up, through all the

10  delays, getting dementia.  So it is kind of difficult when

11  that is there, okay?

12      I think you have seen the letters to the court.  Okay?

13          THE COURT:  I have received all the letters,

14  Mr. Hazelrigg, trust me.

15          THE DEFENDANT:  I appreciate that.

16      And there's some people that really rely on me out there

17  that I do a lot of help for them.  The letter from the

18  individual that -- I don't want to have to mention names --

19  but the Asian gentleman that wrote to you, he has severe

20  cancer.  He goes to chemo once a week.  And I'm their

21  lifeblood.  I am helping them come back from all their

22  losses.  I'm doing collection work, assisting them on, right

23  now, on a lot of their loans that they made.  And I do it all

24  for free, if you read the letter.  I do it because I owe that

25  to them.  And I also owe it to society.  I have a brain.

 1   When I first testified, I said I have a brain but nothing

 2   else works very well anymore.  But I can still help people.

 3   And I will describe some of the things that I would like to

 4   do, if I'm able to do something good for society and pay my

 5   dues that way.  I'm accepting responsibility for the

 6   restitution.  And I'm willing, because I was going to start

 7   doing that anyway in my life, is giving back.

 8       Money means nothing to me now.  I live -- I have been

 9   living so humbled for the last four or five years.  The

10   second I was being investigated by the IRS -- I tried to do

11   business -- nobody will touch you.  They think your phones

12   are tied -- Everybody is scared of the IRS.  Okay.  And so

13   it's been hard.  I have had two or three business deals that

14   I thought I could put together.  They never happened because

15   their attorney says, well, hey, he's got problems with the

16   IRS, you can't do it.  So it's pretty hard to do business.

17   So I'm saying I will spend and work hard for whatever

18   nonprofit you were to put me in charge with, that I could

19   help.

20       I could explain, in one of these letters, that, in one

21   day, the Rainier nonprofit that has small businesses, in one

22   day, I was able to help them collect on a $1.2 million loan

23   that they hadn't had a payment on since last August, and now

24   they have already got the guy -- and he wouldn't return phone

25   calls.  I located the property and got access to it for the

1    client, and I was able to get them an attorney and sent

2    out -- and now they have got a settlement they're working out

3    with the lender.

4         I went to a wonderful lady's Thai restaurant.  And she had

5    problems with her landlord.  Her building had graffiti on it.

6    She didn't know how to deal with getting that off.  Had

7    garbage all along the side of the building.  Had an old sign

8    out in front.  I spent time with her.  She didn't have a

9    lunch menu.  She gave them a handout, to give to people who

10   want to do orders in.  I went and got -- picked up two of my

11   favorite little Thai places, and she has that.

12        There's a lady in a Spanish restaurant, I guess it's a

13   Mexican restaurant, and her husband left her.  She's got a

14   $200,000 bill coming due.

15        I can help these people.  I want to help these people.  I

16   want to spend five hours a day.  I need the rest of the time

17   to try to get healthy.  I will go into that.

18        And the good news is, I have one nonprofit, if you were to

19   accept them, that wants me to start right away.  And they

20   want to give me at least a year.  And if you tell me I have

21   got to spend two years, I will do whatever you tell me when

22   it comes to those areas.  I am never late.  I'm very

23   disciplined.  If you had Tom Fitzgerald here with the

24   probation department, he's walked in on me numerous times,

25   and the gal before, they just show up at your house.  It's

 1   the same old story.  I'm in my bathrobe.  I have got a Life

 2   Alert on me that my son bought for me about five -- The last

 3   time -- See this fingernail right here?  They say, you know,

 4   I don't have TIAs.  Lorraine -- Is it Bolle or -- When

 5   Stephan and I went into her office, my whole right leg was

 6   black and blue, and this was back up here, because it was in

 7   January, where I just went down and I fell.  I don't go down

 8   to pick up things.  I go like this and pick them up.

 9        And I will go into the medical part now, but basically --

10   I apologize for the length of time, but it's pretty emotional

11   when you got some people -- when you -- I can't admit that

12   I'm guilty of evading a tax.  I didn't owe it.  I'm sorry

13   it's a different case than what you are used to.  And if I

14   had the right cooperation from the government, I wouldn't be

15   sitting here today.

16        Now, if you would just take some time, I would like to go

17   through it.  I sent you an updated medical.

18             THE COURT:  I have read it.

19             THE DEFENDANT:  Okay.  I just want to show you this

20   as an example.  Do you see this picture?  There's only one

21   guy on the left, No. 85, that had a neck guard on.  This

22   picture is in 1966.  Okay.  I have been told -- And you have

23   a copy of my Denver Bronco release.  They wanted to

24   immediately take me into surgery and take bone off my hip and

25   fuse my vertebras.  I haven't worn a tie in years, but I did,

1   out of respect for you, today.  But my neck hurts 24/7.  When

2   I go to bed at night, I wake up at least -- And my son was

3   nice enough and gracious enough to buy a custom bed that I --

4   he spent a couple thousands dollars on, that is very soft and

5   pliable, to try to allow me to sleep through the night.  I

6   have pillows that go up between my legs, and I have a pillow

7   that I have to hold onto, and I have a special pillow up

8   here.  I still wake up every hour and a half, two hours, with

9   two fingers numb, three fingers numb, a whole hand numb, and

10  I shake, shake, shake.  And my doctor in Albuquerque that I

11  had, three and a half years ago, he said, you are going to

12  wake up one morning, Mr. Hazelrigg, if you don't get this

13  surgery, and it's going to seem permanently numb.  I want

14  that surgery.  I have been told to get that surgery since

15  1968 by the Denver Broncos.

16      I have a high pain threshold.  When I had my last -- if

17  you have seen the picture -- I wasn't supposed to be at

18  trial.  If you look at the letter from Dr. Robinson, they

19  wanted to schedule me six months before trial to go in, and

20  instead, I put it off until October.  There's a letter from

21  Dr. Robinson that says put it off until October.  Well, out

22  of respect for the court and the scheduling and everything

23  involved, I risked my life coming in here for this trial, and

24  then never was provided the documents I needed to prove my

25  innocence.  It's very upsetting.

1      So if you look at my Christmas -- the picture of me there

2   was on December 23rd, at Virginia Mason, after spending two

3   and a half hours with Dr. Robinson putting a stent in my

4   carotid artery.  My carotid artery at the time, a year ago,

5   was a level 60.  It got up over 70, and that's the point they

6   put a stent in.  The one back here, they put in in December

7   of 2013.  If you read the Eisenhower Medical, that one was

8   blocked 95 percent.  I almost died on the table.  For both

9   procedures -- I'm an anti-drug guy.  I've never had a

10   painkiller prescription in my life -- they want to put you

11   under and they want to sedate you.  I was awake for that

12   entire surgery, and I did multiplication tables in any head.

13   I would like to teach people how to deal with pain, because I

14   have had level eight or nine pain in my neck every day of my

15   life.  I don't complain.  The only reason I haven't had the

16   surgery -- I have been told to have it -- it's because I had

17   too much always going on.  I figured it could be life-

18   threatening.  But I want to fix my neck.

19      My lower back, you will see on the Denver Bronco report, I

20   had spondylolisthesis, L3, L5.  I have a knife sticking in my

21   back 24/7.  It's caused my legs to go numb.  From here down,

22   I am numb.  I could walk on glass right now, Your Honor, and

23   I wouldn't feel a thing.  Six years ago -- They're saying I

24   haven't been recommended for surgery.  I have always said I

25   had too much going on; I can't take time out for surgery.

1    Six years ago, Virginia Mason scheduled me for surgery on my

2    lower back because it had gone numb up here and it wasn't

3    numb below the knees.  It was a whole different thing.  I had

4    taken a shower and sneezed and was on the ground, and they

5    wanted to schedule surgery.  I dealt with the pain in a

6    couple weeks.  I put it off.  But if you look at my

7    spondylolisthesis, that surgery, I'm going to have.  I'm

8    going to have the surgery on my neck.

9        Now let's go to my heart.  You saw the letter from

10   Dr. Gurule that pretty much says I shouldn't have any stress

11   in my life.  I shouldn't be up here standing here right now.

12   I'm very -- My doctor didn't think I would survive the trial,

13   to be honest with you.  And that's why, right after it, I got

14   in and had that stent put in.  But let me tell you the

15   problem with that.  I had that stent put in, and there's a

16   result here -- they just did a CAT scan on me -- and I am

17   already 50 to 69 percent blocked.  So guess what happens

18   next?  With my artery disease, usually I'm pretty good for

19   about a year now before I have to have a procedure.  That's

20   going to get blocked again, and this time, instead of putting

21   a stent in, they're going to have to take an artery off of

22   part of me.  And it's high risk, where they put a new carotid

23   artery in.  That's my next thing I have to look forward to.

24   So I'm not making up stories about my needs for three

25   procedures.

1        Back to my heart, you saw the letter from my doctor that I

2   had in New Mexico.  He didn't even want me to get on a plane.

3   He didn't want me to have any stress.  It's right here.

4        I need ongoing treatments.  When you have a stent put in,

5   you have to wait six months for an MRI because it could be

6   torn loose.  So I am scheduled for an MRI in June at Virginia

7   Mason, to see if it's holding, to see if it's gotten clogged.

8   And it's a very important procedure.

9        There's only three prisons that their doctor said I could

10  even go to in this country, one in the Midwest, one in Texas,

11  and Terminal Island.  So if they're saying I'm the average

12  68-year-old, why can I only go to three prisons?  That's in

13  their own doctor's report, which you have.  Okay.

14       I need three procedures.  If I am incarcerated, I'm going

15  to do those.  To me, I'm going on vacation, I'm going to get

16  myself fixed up.  But I won't live to 75.  I'm not going to

17  live for six more years.  Really, I'm a walking time bomb

18  with my artery diseases.  I've got -- How would you like to

19  carry around with you -- I brought them with me -- but

20  there's about nine sets of pills that I take every night.  I

21  never thought I would be like that.  I get chest pains.

22  Nitroglycerin.  It stops me from having a heart attack.  In

23  Albuquerque, I spent -- it was really bad.  I had not worked

24  out in a while.  And I went to a one-hour session.  Halfway

25  through, I passed out.  The next thing I know, I'm in an

1  ambulance to the hospital, the Albuquerque Hospital.  They

2  roll me in.  I'm in there.  They say, we're doing a four-way

3  bypass.  I don't know who these doctors are.  My dad was the

4  town surgeon, Duke Medical, and I figured I had better get a

5  second opinion.  So I said, sarcastically, "Have you ever

6  heard of stents?"  Well, he said, you need four of them.  I

7  said, well, put four of them in.  They said, well, we have

8  been in your heart too long, too much dye, we're going to put

9  two in right now.  If you read the letter from the doctor, he

10 says:  The patient still has nonobstructive disease in his

11 remaining arteries.  I'm a walking time bomb.  I want to take

12 care of myself.

13     I would like to dedicate my life, and I'm making you an

14 offer right now that you probably haven't heard of before,

15 but I have enough friends, including Andy Carrigan in the

16 audience here, Dan Kirby, my -- I'm not going to ask for

17 family members -- but I want to go and make an offer to the

18 court that if I can stay out and live, that I -- give me 60

19 days to bring in my principal balance of $280,000 to the

20 court and show that I mean doing the right thing about the

21 tax.  It's not that I believe I owe it, but, hey, I'm the one

22 that ignored it, I'm the one that, in 2005, went to an

23 attorney with an intent to say pay it, sue them, what do you

24 recommend?  Now his testimony is all over the place because

25 it's quite a few years ago.  But the bottom line is, I didn't

1    have to go see an attorney.  Nobody was knocking on my door.

2    I made an effort because I believe in dealing with the

3    government and their taxes.

4        So let me finish the Eric deGooyer story.  So we keep him

5    in the office.  After about a week, Eric, suddenly -- I said,

6    Eric, okay, you owe 800-and-some-thousand dollars.  I made

7    him write the check on the spot.  He will probably never

8    forgive me for that.  But that's who I am when it comes to

9    taxes.  Then it goes on even more.  After he's done that, I

10   said, well, you have got to catch up your taxes.  Anne

11   Stockton, I sent her $5,000 -- because I love Eric -- get

12   together with Eric and help him on his old taxes.  She ran

13   through it, and I gave her another 5,000.  Then she died.

14   Then call Tom Kenyon, get him.  You guys can call him.  Tom

15   Kenyon, I got ahold of Tom.  I said, Tom, you are the only

16   other accountant I know.  You are unemployed because Mastro

17   is bankrupt.  Can I send you some money?  Will you help Eric

18   with his taxes?  So I sent him money.  And that's my attitude

19   on taxes.  And I told my children always to report your

20   income.

21       I challenge the government to indict me on any penny that

22   ever showed up anywhere in all that system that didn't have

23   taxes paid on it.  The fact it went to Mastro's office, Anne

24   Stockton directed that.  Anne Stockton isn't here to talk

25   because this thing got delayed so long.

1        So, Your Honor, based on the intent and my willingness --

2   I also want to propose to the court that, on restitution, I'm

3   willing to make $1,400 a month, off of my social security,

4   and the court has recommended 10 percent above that goes to

5   restitution.  You come up with a number, if it's 33 percent,

6   if it's 50 percent.  I will never, ever lie because I know I

7   will go to prison if I do.  In the terms, I have to report

8   every penny I make.  And if I make anything and if I get this

9   resolved -- I'm hoping people will at least want to do

10  business with me again, because they always have in the

11  past -- I will give you whatever percentage you come up with

12  of every dollar that comes in my door.

13        I have been able to live on what they consider a poverty

14  level.  I don't go to fancy restaurants anymore, I don't

15  drive fancy cars.  Somebody loans me a car.  And you are

16  aware of that.  And that's who I am.  It's not what they're

17  saying.

18        I'm just tired of being beat up, and that is the truth.

19  And take your time, if you --

20        And then I just want to end with this:  These are my two

21  grandkids that live on Mercer Island.  The boy needs to be

22  toughened up a little bit.  My daughter wants me to spend

23  more time with him on his sports.  And the daughter just

24  loves hanging out.  One day, when I walked over there, she

25  says, "Eat the grass," so I will pick up some grass and eat

1    it.  I don't want to lose the opportunity to be their

2    grandfather.

3        And that's it.  I will respect whatever you decide to do.

4    And think of the alternatives that I have offered you, okay?

5            THE COURT:  All right.  Thank you, Mr. Hazelrigg.

6        Please remain standing, sir.  I'm going to impose a

7    sentence.

8            THE DEFENDANT:  I'm hard of hearing.

9            THE COURT:  Just remain standing.

10           THE DEFENDANT:  Oh.  Oh.  Oh, okay.

11           THE COURT:  I have listened to everything that's been

12   said.  You know, this is, I think, a tragic case.  The

13   defendant grew up having all the benefits of a family and a

14   father.  I think your father was a doctor.

15           THE DEFENDANT:  A nice man.

16           THE COURT:  You went to a wonderful university.  You

17   got a degree.  You were a sports athlete.  You have made a

18   lot of money over the years.  But we're not standing here

19   today because you ran out of money.  We're standing here

20   today because you didn't pay your taxes and you created an

21   elaborate scheme to put all your assets elsewhere, where you

22   weren't identified with it.  This case goes back to 1993,

23   when the government began auditing you for the years '89,

24   '90, '91.  After an appeal, there was a settlement.  You

25   agreed to pay the government, with interest, approximately

1   $533,000.  And it's really tragic that you didn't choose to

2   do that because that 533,000 has now grown to over a million

3   dollars, which is the restitution I'm going to impose.  I

4   find that the government's calculations on the amounts are

5   appropriate.  But what you did, beginning for about a

6   ten-year period, is, you held property in other people's

7   names, but you at the same time made an incredible amount of

8   money.  For most of us, if you made $10 million in a year or

9   in a couple of years, that's a pretty good income.  I mean,

10  most people never see that in a lifetime.  You made that

11  money, but you chose to live the good life and to avoid

12  paying the taxes.  And you did it by using other people.  You

13  used your kids -- they're not kids; they're adults -- you

14  used other people, friends, and you created a maze that was

15  very sophisticated.  If you had used half those talents to

16  just pay your taxes, we wouldn't be sitting here today.

17       One of the things that I indicated was that these

18  guidelines are not -- I'm not bound by them, but they are

19  quite appropriate in determining what's an appropriate

20  sentence under all the circumstances.  What I need to do is

21  look at the various sentencing factors under the statute to

22  determine what's an appropriate sentence.

23       In my opinion, your conduct is aggravated.  You went to

24  extremes to keep money from the IRS, from paying what you

25  agreed to pay.  And you manipulated, as I say, family members

1   and friends and acquaintances to accomplish the goal.  You

2   used your sons to place property in their names and hide your

3   income.  You were the one that was controlling what came out

4   of the businesses you were involved with.

5       I also have to look at your history and characteristics.

6   And one of the things that I do need to look at is your

7   health problems.  I have studied your medical records.  And,

8   no doubt, you have heart problems, you have chronic neck

9   problems, you have back problems.  The question is whether or

10  not someone who's got medical problems can go out and commit

11  crimes and avoid prison because they have got medical

12  problems.  The Bureau of Prisons has got significant,

13  adequate medical facilities to treat various kinds of medical

14  problems.

15      I also recognize that you have never had a prior

16  conviction.  You have got a criminal history category I.  And

17  you have done a lot of good things in your life.  And I need

18  to take all of that into account in determining what's a

19  necessary sentence, but not greater than is necessary under

20  all the circumstances.

21      You know, you stand here today and say, "I didn't believe

22  I owed any taxes."  That's not credible.  It's just not true.

23  You knew from the get-go that you owed these taxes.  You

24  agreed to pay them.  You entered into an agreement with the

25  IRS.  So you knew you owed those taxes.  And the only reason

1    we're standing here today is because you didn't pay those

2    taxes, notwithstanding the fact that you made more than

3    $10 million during the period of time when the government was

4    asking you to pay those taxes.

5        I'm going to sentence you in this case to a period of 54

6    months in prison, four and one-half years.  The only reason

7    I'm not giving you a guideline sentence is because of your

8    medical condition.  But I believe that a four-and-a-half-year

9    sentence is appropriate, necessary, in order to deter others,

10   to appropriately sentence you for your conduct.

11       As I indicated earlier, I find that you got up on that

12   stand and lied about what happened.  You didn't have to

13   testify, but you did have to testify truthfully.  And you

14   didn't do that.

15       I'm going to follow the period of incarceration of 54

16   months with three years of supervised release, subject to all

17   the standard conditions of supervised release that are set

18   forth in the sentencing recommendations.  I find you don't

19   have the ability to pay a fine.  I'm going to waive the fine.

20   But I am going to impose restitution in the amount of

21   $1,082,249.46, which is the amount that's been calculated by

22   the government.  I believe it's correct.  And I'm going to

23   assess a $200 special assessment.

24       And I'm going to advise you that you have a right to

25   appeal, obviously.  You know that right.  But you must file

1    the notice of appeal within 14 days of today, when I sign the

2    judgment in your case.

3        The government has asked for me to remand you into custody

4    today.  I'm not going to do that.  You have been on release

5    status, and I don't expect you are going to go anywhere.  You

6    will be permitted to self-report.

7        And I ask you whether you have a recommendations of where

8    you would like to be placed.

9            THE DEFENDANT:  Well, considering my health issues,

10   the only one would be Terminal Island.  At least it's on the

11   West Coast where my family can --

12           THE COURT:  I will make that recommendation.

13       You should understand that the Bureau of Prisons is going

14   to determine where you will be placed, but the recommendation

15   may carry some weight.  But I think that they will place you

16   in a facility that has the medical facilities adequate to

17   take care of your needs.  So I would ask the government to

18   put that in the judgment.

19       But I have advised you, I believe, that you need to file

20   your notice of appeal within 14 days.

21       You will be notified by probation as to when and where to

22   report.  You will be required to then report at the

23   designated facility, unless you can't afford to be

24   transported there on your own.  If so, you and your attorney

25   can make an appropriate request and we will deal with it if

 1    that's so.

 2       Do you understand, sir?

 3            THE DEFENDANT:  Yes, I do.  And I will report on

 4    time.

 5       Do I have about 30 days to try to clean up my --

 6            THE COURT:  You will have at least 30 days.

 7            THE DEFENDANT:  That would be helpful.

 8            THE COURT:  What's it going to be?  Closer to --

 9            MS. BOLLE:  It takes about three weeks before we even

10    get a notice of where they will be placed.

11            THE COURT:  I think it's going to be four to eight

12    weeks before you -- You will be designated within probably

13    three or four weeks, but your report date will then be

14    several weeks beyond.

15            THE DEFENDANT:  What about MRIs and CAT scans?  I

16    have found they don't have them at the prison.

17            THE COURT:  I'm satisfied that the Bureau of Prisons

18    will be able to provide you with the necessary medical care

19    that you are in need of.

20       Does the government have a judgment to present?

21            MR. DIGGS:  We do, Your Honor.  I will show it to

22    defense counsel.

23            MR. ILLA:  Your Honor, I have reviewed the judgment.

24    It appears to comport with the court's oral ruling with one

25    exception, which Mr. Diggs will address.

1          MR. DIGGS:  Your Honor, we drafted the judgment to

2   say 54 months as to Count 1 and 2, to be served concurrently.

3          THE COURT:  Yes.  And that was my intent.  Thank you

4   for clarifying that.

5          MR. ILLA:  Thank you.

6          MR. DIGGS:  May I approach?

7          THE COURT:  Yes.

8      All right.  I have signed the judgment, and it will be

9   filed.

10     Anything further to come before the court in this matter?

11         MR. DIGGS:  No, Your Honor.  Thank you.

12         MR. ILLA:  No.  Thank you, Your Honor.

13         THE COURT:  We will be in recess.

14                    (Proceedings adjourned.)

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


I, Nickoline M. Drury, RMR, CRR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.


Dated this 13th day of April, 2015.


Nickoline Drury
OFFICIAL COURT REPORTER